NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

15-P-848                                      Appeals Court

REGINA ROSEN  vs.  SCOTT ROSEN.

No. 15-P-848.

Essex.     April 8, 2016. - November 22, 2016.

Present:  Kafker, C.J., Wolohojian, & Maldonado, JJ.

Divorce and Separation, Child support, Modification of judgment, Child custody. Parent and Child, Child support, Custody. Contempt.

Complaint for divorce filed in the Essex Division of the Probate and Family Court Department on January 17, 2001.

Complaints for modification and contempt, filed on August 2, 2011, and October 12, 2012, respectively, were heard by Susan D. Ricci, J.; a motion for reconsideration, filed on July 7, 2014 was heard by her, and judgment was entered by her.

Mary-Ellen Manning for the mother.
Mark A. Perkins for the father.

WOLOHOJIAN, J.  Today we reach the question left open in T.M. v. L.H., 50 Mass. App. Ct. 856, 861 (2001), namely, whether "a judge, in compelling circumstances of an equitable nature, and without contravening G. L. c. 119A, § 13(a), may apply a

credit in calculating child support arrearages to reflect payments made in a manner other than as directed by the original [child support] order."[1]  We conclude that, despite the statutory prohibition against retroactive modification of child support judgments "except with respect to any period during which there is pending a complaint for modification," G. L. c. 119A, § 13(a), inserted by St. 1987, c. 714, § 1, a judge may -- in certain very limited circumstances -- grant and apply such an equitable credit to offset a child support arrearage accrued during a period when there was no pending complaint for modification.

Background.  After fourteen years of marriage, the parties divorced on July 14, 2003, pursuant to a judgment of divorce which incorporated the parties' separation agreement.  The separation agreement provided, in pertinent part, that the

---

[1] In Whelan v. Frisbee, a case decided more than a decade before T.M., this court discerned "no error in the entry of judgment for [the father] on [the mother's] complaint for contempt" where the trial judge "found that . . . although [the father] was determined to be in arrears in the amount of $5,190, he had accounted for these payments by his assumption of all college tuition and related expenses of the children."  Whelan v. Frisbee, 29 Mass. App. Ct. 76, 82 (1990), citing Whitten v. Durkee, 327 Mass. 562, 562-564 (1951).  Although our decision in Whelan could arguably be viewed as implicitly supporting the "equitable credit" concept, we were not asked in that case to decide whether the offset amounted to an impermissible retroactive modification of child support in violation of G. L. c. 119A, § 13(a).  See Whelan, supra at 82 n.7.  Therefore, in our view, Whelan did not decide the issue we confront here.

mother would have primary physical custody of the parties' three children, Elliot, Ari, and Hannah, and that the father would pay monthly child support in the amount of $4,500.  The separation agreement also contained several provisions relating to the children's college education.  In one of those provisions, the parties "agree[d] that the choice of college or other institutions shall be made jointly, with due regard to the children's wishes, welfare, needs and aptitudes, and the parties' respective financial circumstances.  Neither party shall make commitments to a . . . college . . . without first notifying the other and obtaining his or her approval . . . ."  The parties also "agree[d] to contribute to the college costs of the children to the best of their financial ability."  The separation agreement's provisions relating to "custody, care, visitation, support, education and medical care of the parties' minor children" were merged with the judgment of divorce, while the remaining provisions survived and were not merged with the judgment.

At the time of the divorce in 2003, all three children lived with the mother.  However, by January 1, 2007, the parties' oldest child, Elliot, had moved into the father's home. The father thereafter reduced his child support payments by one-third, to $3,000 per month, without court approval.

More than two years later, on April 4, 2009, the parties entered into a signed and notarized "Agreement for Judgment on Modification" (2009 agreement), which provided that the father would pay monthly child support of $3,400, along with a lump sum of $2,500 upon the court's approval of the 2009 agreement, and an additional $2,900 over the next six months. On April 9, 2009, the father filed the 2009 agreement with the Probate and Family Court; however, it was returned to him without being docketed due to certain procedural deficiencies.[2] Those deficiencies were not cured, and the 2009 agreement was never refiled with the Probate and Family Court.

By August, 2011, the parties' second child, Ari, had also moved into the father's home. In early August, 2011, the father filed another complaint for modification (2011 complaint for modification), which he served on the mother on August 11, 2011. In the 2011 complaint for modification, the father requested (1) a reduction in his child support in light of the fact that two of the three children were living with him, and (2) an order requiring the mother to contribute to the children's college expenses. On October 13, 2011, a judge of the Probate and

_____

[2] The "Rejection Notice" accompanying the returned filings indicated that the parties' "Joint Petition for Modification" could not be processed due to "deficiencies in the form of the petition," and the absence of both a "Child Support Guidelines Worksheet" and a financial statement for the mother.

Family Court allowed the father's motion for temporary orders, reducing the father's child support payments from $4,500 per month to $200 per week.

In December, 2011, the parties' third child, Hannah, moved into the father's home, at which point all three children were living with the father and principally dependent on him for support and maintenance. On May 4, 2012, the judge allowed the father's motion to terminate child support.

On October 12, 2012, the mother filed a complaint for contempt asserting that the father was approximately $103,701 in arrears for child support that accrued before the court's October 13, 2011, temporary order.

On July 17, 2014, following a six-day trial on the consolidated modification and contempt proceedings, the Probate and Family Court entered an "Amended Judgment of Modification," an "Amended Judgment on Contempt," and supporting "Amended . . . Findings of Fact."[3] In the amended judgment of modification, the

---

[3] The original judgment on contempt and judgment of modification were dated June 9, 2014, and were docketed on June 20, 2014. However, the father filed a motion for reconsideration seeking, among other things, correction of a mathematical error with respect to his child support arrearages, and contribution from the mother toward the children's college expenses. On July 17, 2014, the judge allowed the father's motion in part and entered the amended judgments reflecting the corrected child support arrearages and requiring the mother to reimburse the father for a portion of the children's college expenses.

judge reduced the father's child support obligation to $280 per week, retroactive to August 11, 2011, the date on which the mother had been served with the 2011 complaint for modification. The judge terminated the father's child support obligation retroactive to December 31, 2011, the date upon which "[all] three children were solely dependent upon and residing with [the] [f]ather." The judge further ordered the mother to reimburse the father for "approximately seventeen percent (17%) of the college education expenses of the three children either paid or undertaken in the form of a loan by [the] [f]ather" from August 11, 2011, through December 31, 2011, and ten percent of the college expenses "[f]rom January 1, 2012 going forward."

In the amended judgment on contempt, the judge acknowledged that while she could not "validate" the 2009 agreement as a defense to contempt, see Quinn v. Quinn, 49 Mass. App. Ct. 144, 145-148 (2000), she did not find the father in "wilful contempt" of his child support obligation. The judge found that, from January 1, 2007, to December 31, 2011, the father's total child support obligation was $254,697, taking into account the retroactively modified child support beginning on August 11, 2011. The judge determined that from January, 2007, to May, 2012, the father made child support payments to the mother

totaling $190,737.[4]  The judge found that the father was "entitled to an equitable credit" of $500 per month "for his sole support of Elliot from January 1, 2007 to August 11, 2011." After applying the total equitable credit of $28,177, the judge determined that the father had child support arrearages of $35,783.  The judge ordered the father to pay the arrearages to the mother within thirty days, "minus the college educational expenses" owed by the mother under the amended judgment of modification.  This appeal followed.

Discussion.[5]  1.  Equitable credit.  The mother challenges the $28,177 equitable credit the judge used to offset some of the father's child support arrearage for the period from January 1, 2007, to August 11, 2011, when Elliot was living with him. The mother argues that this equitable credit effectively constitutes a retroactive modification of child support that was

---

[4] The total should have been $191,137.  See note 21, infra.

[5] As a threshold matter, the mother contends that the judge did not have the power to modify the separation agreement because it survived the divorce judgment.  See Whelan v. Frisbee, 29 Mass. App. Ct. at 80-81, quoting from Ames v. Perry, 406 Mass. 236, 240 (1989) ("'[A] separation agreement, which survives a divorce judgment and is valid at the time of the entry of that judgment [that is free from fraud and coercion and fair and reasonable] should be specifically enforced,' absent changed circumstances which give rise to countervailing equities").  The mother's argument fails because the child-related provisions contained in the separation agreement, including those pertaining to the children's "support" and "education," were expressly merged with the divorce judgment and did not survive.

outside the judge's power to award because no complaint for modification was pending.[6] See G. L. c. 119A, § 13(a). The father contends that there was no retroactive reduction of his support obligation; rather, the credit merely reflected that he had satisfied a portion of his child support obligation by providing direct or actual support to Elliot while Elliot was living with him.

In weighing the parties' arguments, we must also consider the broader context in which G. L. c. 119A, § 13(a), was enacted. "The Federal Government has created an elaborate procedural mechanism designed to help both the government and custodial parents to secure the payments to which they are entitled." Turner v. Rogers, 564 U.S. 431, 444 (2011), citing Blessing v. Freestone, 520 U.S. 329, 333 (1997). To that end, a

---

[6] The mother further argues that the judge erred by granting the father an equitable credit for his payment of the children's college expenses. The argument is factually incorrect; the judge did not award the father an equitable credit for his payment of the children's college expenses. Although the judge considered the amount of college expenses paid by the father on behalf of all three children as one of many equitable factors weighing in favor of granting the father a credit for his support of Elliot, the equitable credit was not based on those payments but rather on the father's sole support of Elliot, including Elliot's "housing, food, clothing, insurance, transportation, and medical expenses." We note that, had the judge credited the father for his payment of the children's college expenses (as the mother argues), the equitable credit would have substantially exceeded the father's child support arrearages. Since this is not the case, it is clear that the amount of the equitable credit was not based on the college expenses.

State's eligibility for certain Federal grants[7] is conditioned on the operation of a child support enforcement program that conforms to the Child Support Enforcement Act (CSEA), Title IV, Part D of the Social Security Act, 42 U.S.C. §§ 651-669b (2012).[8] See Blessing v. Freestone, supra. See also Doucette v. Ives, 947 F.2d 21, 24 (1st Cir. 1991). As a participating State, Massachusetts has enacted G. L. c. 119A, §§ 1 et seq., which "provides for child support enforcement services in accordance with the provisions of [the CSEA]." Morales v. Morales, 464 Mass. 507, 510 n.5 (2013).

General Laws c. 119A, § 13(a), provides that "[a]ny payment or installment of support under any child support order issued by any court of this commonwealth . . . shall be on or after the

---

[7] Participating States receive funds from the Aid to Families with Dependent Children (AFDC) program, which "provides subsistence welfare benefits to needy families." Blessing v. Freestone, 520 U.S. at 333, citing Title IV, Part A of the Social Security Act, 42 U.S.C. §§ 601-617.

[8] "The collection and distribution by the state of child support payments . . . is governed by the Child Support Enforcement Act, 42 U.S.C. §§ 651-666, Title IV-D of the Social Security Act. The CSE program is designed both to assist parents in collecting child support from absent parents and to reduce state and federal government AFDC expenditures, which are often necessitated by the failure of noncustodial parents to meet their support obligations. All states participating in the AFDC program are required to have child support collection programs, 42 U.S.C. § 602(a)(27), through which they assist families in establishing paternity, locating parents, and collecting support through wage withholding, liens on property, and withholding from unemployment compensation and tax refunds." Doucette v. Ives, 947 F.2d 21, 24 (1st Cir. 1991).

date it is due, a judgment by operation of law . . . [and] shall not be subject to retroactive modification except with respect to any period during which there is pending a complaint for modification, but only from the date that notice of such complaint has been given."[9]  In enacting § 13(a), "the Legislature limited the power of a judge to reduce retroactively any arrearages in child support except for any period during which there is a pending complaint for modification."  T.M. v.

---

[9] General Laws c. 119A, § 13(a), was enacted in response to 42 U.S.C. § 666(a)(9), which went into effect on Oct. 21, 1986, and prescribed the following:

"(a) [E]ach State must have in effect laws requiring the use of the following procedures . . . to increase the effectiveness of the program which the State administers under [the CSEA]:

. . .

    "(9) Procedures which require that any payment or installment of support under any child support order . . . is (on and after the date it is due) --

        "(A) a judgment by operation of law, with the full force, effect, and attributes of a judgment of the State, including the ability to be enforced,

        "(B) entitled as a judgment to full faith and credit in such State and in any other State, and

        "(C) not subject to retroactive modification by such State or by any other State;

"except that such procedures may permit modification with respect to any period during which there is pending a petition for modification, but only from the date that notice of such petition has been given . . . ."

L.H., 50 Mass. App. Ct. at 859, citing Quinn v. Quinn, 49 Mass. App. Ct. at 147-148.  "The object of § 13(a) was to give support orders the finality of other judgments, to assist the [Department of Revenue] in its enforcement efforts."  T.M. v. L.H., supra, quoting from Smith-Clarke v. Clarke, 44 Mass. App. Ct. 404, 406 (1998).  By implicitly prohibiting extra-judicial modifications of child support, § 13(a) furthers the Commonwealth's policy of requiring court oversight for all agreements pertaining to child support.  See White v. Laingor, 434 Mass. 64, 67 (2001), citing Massachusetts Child Support Guidelines, G. L. c. 208, § 28, and G. L. c. 119A, § 1 ("Selected enactments of the Legislature convey the importance of judicial review of child support agreements between parents").  See also Quinn v. Quinn, 49 Mass. App. Ct. at 146, quoting from Knox v. Remick, 371 Mass. 433, 437 (1976) ("[B]ecause '[p]arents may not bargain away the rights of their children to support from either one of them,' . . . the Legislature has placed certain limits on the ability of parents to enter into binding contracts relating to child support").  It is for this reason that we have previously held that an agreement to reduce child support that has not received judicial approval does not constitute a defense to a complaint for contempt.  Quinn v. Quinn, 49 Mass. App. Ct. at 148.

Here, although the parties evidenced an intent to jointly seek modification of the child support order by executing and filing[10] the 2009 agreement with the Probate and Family Court, that filing was rejected on procedural grounds and the matter was not further pursued. As such, there was no "pending" complaint for modification in 2009 for purposes of G. L. c. 119A, § 13(a), and the judge was prohibited from retroactively reducing the father's child support obligation. As the judge correctly determined, she did not obtain authority to reduce retroactively the father's child support obligation until 2011, when the mother was served with the second complaint for modification.[11]

That said, as we acknowledged in T.M. v. L.H., "[A] number of [other] jurisdictions" with statutory provisions similar to G. L. c. 119A, § 13(a), "have recognized . . . special circumstances of an equitable nature . . . that justify the grant of a credit to a support obligor for payments or expenditures made that were not in strict compliance with the support order or judgment." 50 Mass. App. Ct. at 861, citing

---

[10] While the 2009 agreement was apparently never docketed in the Probate and Family Court, the judge found that it was indeed filed on April 9, 2009.

[11] To the extent that the 2009 agreement may have been separately enforceable in a contract action, see Ratchford v. Ratchford, 397 Mass. 114 (1986), the father did not bring such an action.

Alaska Dept. of Rev. v. Campbell, 931 P.2d 416, 419-420 (Alaska 1997), Goold v. Goold, 11 Conn. App. 268, 274-275 (1987), Baer v. Baer, 263 Ga. 574, 575-576 (1993), and Griess v. Griess, 9 Neb. App. 105, 112-113 (2000).  The father urges us to follow those jurisdictions and to rule that "a judge, in compelling circumstances of an equitable nature, and without contravening G. L. c. 119A, § 13(a), may apply a credit in calculating child support arrearages to reflect payments made in a manner other than as directed by the original order."  T.M. v. L.H., 50 Mass. App. Ct. at 861.

Although, as we have noted, a number of other jurisdictions have recognized the concept of equitable credits, they have not done so on uniform grounds.  As a general proposition, we can only say that the concept is clearly rooted in equity and its application is driven by equitable considerations.  Beyond that, we discern three primary strands of analysis:  (1) some courts grant an equitable credit when the elements of equitable estoppel are established; (2) some courts grant an equitable credit when the support obligation has been fulfilled by an alternative method; and (3) some courts simply apply general equitable principles to determine whether an equitable credit is in order.  Regardless of the approach used, the jurisdictions that allow credit on an equitable basis largely agree that the adjustment of support must not be unilateral, the child's need

for adequate support and maintenance must be met through the new arrangement, and the circumstances under which a credit is to be granted must be narrowly construed.[12]  We briefly describe each of the three analytical approaches in more detail.

The jurisdictions that invoke, or rely on, the elements of equitable estoppel -- either to allow credit or to bar recovery of support arrearages -- generally require the support payor to demonstrate that (1) the parties agreed to modify child support; (2) the payor detrimentally relied on the agreement by changing his or her position, such as by assuming physical custody or by assuming additional expenses on behalf of the child; and (3) the agreement is not contrary to the child's welfare.[13]  In our view,

---

[12] See notes 13-15, infra.

[13] See, e.g., In re Marriage of Webber, 191 Ill. App. 3d 327, 330-331 (1989) (equitable estoppel applied where [1] the mother agreed to transfer custody to the father, [2] the court credited the father's testimony that the mother also agreed to suspend child support during that period, and [3] the father reasonably relied on the agreement to his detriment by taking custody of child and providing directly for his needs); In re Marriage of Duerr, 250 Ill. App. 3d 232, 237 (1993) (custodial mother estopped from seeking arrearages where parties agreed to children moving in with noncustodial father, mother provided no support to children during that period, and father reasonably relied on the agreement to his detriment by financially supporting the children, purchasing a larger house, and hiring a nanny); In re Marriage of Harvey, 523 N.W.2d 755, 757 (Iowa 1994) (Equitable estoppel was available where the father demonstrated that [1] the mother orally agreed to transfer custody to the father and to terminate child support, [2] the father relied on the agreement to his detriment by providing all of the child's financial support, and [3] any arrearages recovered by the mother "would not inure for [the child's]

the appeal of this approach is that it draws upon the established legal principles of the existing doctrine of equitable estoppel, requires proof of objectively verifiable facts, and does not recognize or reward unilateral action.

Those jurisdictions that allow a credit when a payor has "satisfied" the original child support obligation by an alternative method in essence create an exception to the

---

support, but solely for [the mother's] benefit"); In re Marriage of Sabo, 224 Mont. 252, 256 (1986) (Equitable estoppel applied where, "[b]y her assent and conduct, [the custodial parent] consented to the shift in custody and support. We cannot equitably allow [the custodial parent] to reap a windfall of support payments, if she never made the support expenditures"); Truman v. Truman, 256 Neb. 628, 635-636 (1999) (equitable estoppel applied where [1] custodial parent agreed to transfer custody to noncustodial parent and terminate child support, [2] noncustodial parent relied on the agreement in good faith and changed his position "by assuming responsibility for the custody and care" of the child, and [3] "[t]here is no evidence that the agreement of the parties was in any way detrimental to the welfare" of the child); State v. Stephen Leo S., 198 W. Va. 234, 240 (1996) ("[T]wo issues [must] be determined in deciding whether to apply the doctrine of equitable estoppel to arrearage child support: [1] will the welfare of the child be negatively affected, and [2] has there been detrimental reliance?"). Compare In re Marriage of Beatty, 279 P.3d 1225, 1230 (Col. Ct. App. 2012) (equitable estoppel not available where the parties agreed to reduce the noncustodial parent's support payments, but the noncustodial parent did not take action to his detriment in reliance on the agreement, such as incurring additional expenses); Matzen v. Matzen, 69 Ill. App. 3d 69, 72-73 (1979) (equitable estoppel not available where the noncustodial parent failed to demonstrate "by clear, precise and unequivocal evidence" that the custodial parent agreed to the custody change and suspension of child support; the court noted that "[e]quitable estoppel is not created by [the custodial parent's] failure to demand payment of support arrearages . . . or by the mere passage of time").

"general rule" that "a support obligor must make his or her payments in the manner required by the support order or judgment." T.M. v. L.H., 50 Mass. App. Ct. at 860, citing Thacker v. Thacker, 710 N.E.2d 942, 944 (Ind. Ct. App. 1999). Some jurisdictions refer to this as credit for "nonconforming" support payments. See, e.g., Smith v. Smith, 793 N.E.2d 282, 285 (Ind. Ct. App. 2003); Meyer v. Block, 123 S.W.3d 316, 326 (Mo. Ct. App. 2003). Regardless of the nomenclature used, these jurisdictions typically limit the credit to expenditures that substantially comply with the "spirit and intent" of the original support order, such as "direct" support of a child living in the payor's home.[14] In our view, this approach does

---

[14] See, e.g., McCreless v. McCreless, 673 So. 2d 438, 440 (Ala. Civ. App. 1995) ("The trial court does have the discretion . . . to give the obligated parent credit for money and gifts given to the child, or for amounts expended while the child lived with the obligated parent or a third party"); In re Marriage of Trainotti, 212 Cal. App. 3d 1072 (1989) (statutory bar against retroactive modification does not prohibit judge from allowing credit based on determination that noncustodial parent assumed custody of child and fulfilled his child support obligation by directly supporting child); Brown v. Georgia Dept. of Human Resources, 263 Ga. 53, 54 (1993) (credit appropriate where "payee consents to payor's voluntary expenditures as an alternative to payor's child support obligation; and payor has substantially complied with the spirit and intent of the divorce decree by discontinuing child support payments while payor has the care and custody of the children and supported the children at the payee's request"); Smith v. Smith, 793 N.E.2d at 285 (credit may be granted to noncustodial parent in the event of nonconforming child support payments, if "noncustodial parent has, by agreement with the custodial parent, assumed custody and has provided food, clothing, shelter, medical attention, and school expenses and has exercised parental control for an

not contain sufficiently objective criteria and could encourage payors having superior economic leverage to unilaterally substitute one form of support for another even where the substitution is not substantially equivalent.

Several other jurisdictions have simply relied on general equitable considerations, taking a variety of factors into

extended period"); Meyer v. Block, 123 S.W.3d at 326, and cases cited ("Equitable principles may permit credit for a nonconforming payment, when those payments were made under the compulsion of the circumstances. . . . Those nonconforming payments must nevertheless substantially comply with the spirit and intent of the terms of the original child support judgment . . . [and] the assent or acquiescence of a custodial parent to the nonconforming payment must be established"); Curtis v. Curtis, 11 S.W.3d 466, 472 (Tex. Ct. App. 2000) (to receive credit for support provided directly to the child while the child was living with the obligor, the obligor must show: [1] that the custodial parent relinquished custody of the child; [2] that relinquishment was for a time period in excess of any court-ordered periods of possession of and access to the child; [3] that actual support was provided to the child; and [4] the value of the support provided must be proven); Schafer v. Schafer, 95 Wash. 2d 78, 82 (1980) (When determining whether to allow credit, the court should consider: "[1] whether the noncustodial parent [a] intended the expenditures for care to be in satisfaction of child support, [b] exerted undue influence over the child to obtain or retain custody, [c] continued to retain custody as a form of retribution; [2] whether the custodial parent [a] was willing and able to provide necessary care for the child, [b] expressly or impliedly consented to the noncustodial parent's continued custody of the child, [c] was relieved of any or all of the reasonable expenses of child support while the child was in the custody of the noncustodial parent; [3] the length of time the child was in the custody of the noncustodial parent; and [4] whether a compelling reason exists requiring the noncustodial parent not only to pay for the child's care while in that parent's custody, but also to comply with the support order to make child support payments to the custodial parent").

account, to determine whether to apply a credit against a child-support arrearage.[15]  This approach concerns us because it does not specify core requirements and thus, over time, could become

_____

[15] See, e.g., Goold v. Goold, 11 Conn. App. at 274-275, and cases cited ("Although there is no general rule as to when circumstances require the allowance of [a credit against past due child support], factors which have been considered by various courts . . . include [1] whether the father brought a motion for modification of the support order; [2] whether the parties expressly provided in their separation agreement that the father may deduct or adjust support payments when the child is no longer in the mother's custody; and [3] whether the mother has in some manner consented to accept the father's direct support of the child as an alternative method of payment of child support"); Nolte v. Nolte, 544 So. 2d 1146, 1147 (Fla. Dist. Ct. App. 1989) (Where the custodial parent expelled the child from her home, causing the child to live with noncustodial parent, the court viewed the child's "expulsion from [the custodial parent's] home as a legitimate equitable reason warranting the [noncustodial parent's] cessation of [child support] payments"); Heflin v. Heflin, 1 So. 3d 820, 826 (La. Ct. App. 2009) (noncustodial parent was not liable for child support arrearages where the parties had an "implied agreement to suspend child support payments after [the custodial parent] voluntarily delivered physical custody of [the child] to [the noncustodial parent] and for 10 years thereafter made no attempt to take custody of [the child] pursuant to the original custody decree"); Griess v. Griess, 9 Neb. App. at 116 (court granted equitable relief by crediting the father for his overpayment of child support for nearly two years due to "grossly incorrect" order; court noted that there was "clear evidence that granting [the father] some sort of credit against his future child support payments will not work a hardship on the children in [the mother's] custody"); Acree v. Acree, 2 Va. App. 151, 157 (1986) ("Where . . . the custodial parent has by his or her own volition entered into an agreement to relinquish custody on a permanent basis and has further agreed to the elimination of support payments and such agreement has been fully performed, we hold that the purpose to be served by application of an inflexible rule denying credit for nonconforming payments is outweighed by the equities involved. . . .  [T]he purpose of the [original] support decree in this case has been fulfilled") (emphasis omitted).

so amorphous as to swallow the general prohibition against retroactive modification in the absence of a pending modification complaint.

Consistent with the views of other jurisdictions, we conclude that a judge is not foreclosed by G. L. c. 119A, § 13(a), from determining whether "compelling circumstances of an equitable nature" warrant the allowance of a credit for the payor's fulfillment of his or her child support obligation "in a manner other than as directed by the original order" but which nevertheless accomplishes the maintenance of the child as envisioned by the original order. T.M. v. L.H., 50 Mass. App. Ct. at 861. That said, because of the clear purpose and policy behind G. L. c. 119A, § 13(a), and to avoid potential abuse, we favor a clearly delineated standard that relies on objectively verifiable facts in order to allow an equitable credit. This means that, although we have drawn from the various considerations and factors present in the three analytical strains we set out above, we conclude that a more rigorous set of clearly identified requirements is appropriate in Massachusetts. Therefore, to receive an equitable credit against a child support arrearage, the support payor must demonstrate that (1) the support recipient agreed (a) to transfer custody of the child to the payor for an extended period of time not contemplated in the original custody order,

and (b) to accept the payor's direct support of the child as an alternative method of satisfying the payor's child support obligation; (2) the custody transfer was not the result of duress, coercion, or undue influence exerted by the payor against either the recipient or the child; (3) the payor provided the child with adequate support and maintenance while the child was principally domiciled in the payor's home; (4) the recipient was relieved of supporting the child during the period in question; (5) the alternative support arrangement was not contrary to the child's best interests; and (6) granting a credit to the payor for his or her direct support of the child would not result in injustice or undue hardship to the recipient.

Where these factors are present, a judge may find "compelling circumstances of an equitable nature" warranting an equitable credit. We stress that the concept of equitable credit is an extremely narrow exception to the general rule that support must be paid in the manner originally ordered. The exception is necessarily narrow so as to prevent a support payor from "modify[ing] unilaterally a support order or interfer[ing] with the right of the custodial parent to decide how support money should be spent," T.M. v. L.H., 50 Mass. App. Ct. at 860, citing Alaska Dept. of Rev. v. Campbell, 931 P.2d at 420, and Goold v. Goold, 11 Conn. App. at 274, while also ensuring that

the child, rather than the support recipient who has been relieved of supporting the child, is the beneficiary of the payor's support.  "This is consistent with the articulated public policy of the Commonwealth that 'dependent children shall be maintained, as completely as possible, from the resources of their parents.'"  Lombardi v. Lombardi, 68 Mass. App. Ct. 407, 415 (2007), quoting from G. L. c. 119A, § 1, and citing L.W.K. v. E.R.C., 432 Mass. 438, 446 (2000).  See Boulter-Hedley v. Boulter, 429 Mass. 808, 813 (1999), citing G. L. c. 119A, §§ 1, 13(c), and G. L. c. 208, § 28 ("Two central policies furthered by the Massachusetts child support scheme are [1] caring for the best interests of children, and [2] ensuring that the taxpayers are secondary to the parents in meeting the financial needs of children").  Moreover, by confining this exception to its narrowest scope, we promote the general principle that judges -- rather than the parties -- are vested with the responsibility to determine what is in the best interests of the child.  See White v. Laingor, 434 Mass. at 68, citing, inter alia, McCarthy v. McCarthy, 36 Mass. App. Ct. 490, 493 (1994) ("[J]udges must be satisfied that the best interests of the child are not compromised. . . .  [T]he presence of a negotiated agreement between the parents does not exempt judges from the need to protect children").

Applying the principles we have just set out to the facts of this case, we conclude that the judge was warranted in allowing an equitable credit of $500 per month for the father's direct support of Elliot from January 1, 2007, to August 11, 2011. It is undisputed that Elliot moved into the father's home no later than January 1, 2007. There is no indication or contention that Elliot's move was the result of duress, coercion, or undue influence exerted by the father.[16] It is also undisputed that Elliot received adequate support from the father while living in the father's home, and that the mother was relieved of supporting Elliot during that period.

It is clear that the mother consented to accept the father's direct support of Elliot as an alternative method of fulfilling his support obligation no later than April 4, 2009, when, as the judge found, she "willingly, freely and voluntarily" executed the 2009 agreement. What remains, therefore, is the question whether the evidence warranted the judge's finding that the mother consented even earlier, in 2007, when Elliot went to live with his father. We conclude that the evidence supports such a finding. The judge credited the father's testimony that "after Elliot moved in with [the

---

[16] While not addressed in the judge's findings, it appears that the mother was living in Connecticut at the time and Elliot, an aspiring musician, wanted to live with the father in order to pursue musical opportunities in the Boston area.

father], the parties agreed to reduce the child support to $3,000.00 [per] month." Although the mother testified that she agreed with the move, but not with the reduction in child support, the judge apparently did not find the mother credible in this regard because the mother later "confirmed" that she "requested a change to [the parties'] child support agreement" in early 2009, by seeking "an increase from $3,000.00 [per] month to $3,400.00 [per] month," which was consistent with the father's testimony. The mother also testified that she did not believe the father owed her any "back child support" when he filed the 2011 complaint for modification.[17] Accordingly, the judge's determination that the parties agreed to the alternative support arrangement in 2007 was "based on an assessment of [each party's] credibility" -- an assessment that is "quintessentially the domain of the trial judge" and "close to immune from reversal on appeal except on the most compelling of showings." Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995), citing Goddard v. Dupree, 322 Mass. 247, 248 (1948), and Palmer v. Palmer, 23 Mass. App. Ct. 245, 252 (1986). As there is nothing in the record that would warrant disturbing the judge's credibility assessment, especially in light of the mother's own

_____

[17] Moreover, the "parties acknowledge[d]" in the 2009 agreement that "neither party currently owes anything else to the other," apart from the $5,400 sum the father agreed to pay upon executing the 2009 agreement.

internally contradictory testimony, we are satisfied that the evidence supports the judge's finding that the mother consented to the alternative support arrangement in January, 2007.

Finally, there is no indication that the alternative support arrangement was contrary to Elliot's best interests, or that granting the credit to the father would result in injustice or undue hardship to the mother.  The mother was not required to return a portion of the child support previously paid by the father.  We note also that the equitable credit was only $500 per month, even though it appears that the parties themselves allocated $1,500 per child per month.[18]

We therefore conclude that the facts of this case present "compelling circumstances of an equitable nature," T.M. v. L.H., 50 Mass. App. Ct. at 861, warranting the allowance of a $28,177 equitable credit to the father for his direct support of Elliot in conformance with the maintenance of the child as provided in the original support order.  Compare id. at 862 (identifying several factors that rendered the credit inappropriate, including that the child was already emancipated when the father paid for his funeral expenses, the fact that the mother did not

---

[18] Although the parties agreed to a monthly reduction of $1,500 from 2007 to 2009, and $1,100 from 2009 onward, the judge was not bound by those figures in calculating the credit.  The amount of the credit was within the judge's discretion to determine, and we discern no error in the judge's decision to allow a credit of $500 per month.

agree "to accept the father's payment of funeral expenses as an alternative method of payment of child support," and that it was "difficult to perceive how the father's payment of funeral expenses constitute[d] 'substantial compliance' with the child support order," as "the purpose of the order was to provide for the support of the children during their dependency, a duty that the father failed absolutely to fulfill").

2. Contempt. The mother contends that the father should have been found to be in contempt because it was undisputed that (1) the father's child support obligation had not been modified by the 2009 agreement, and (2) the father had the ability to pay the full amount of child support required by the divorce judgment.

"[A] civil contempt finding [must] be supported by clear and convincing evidence of disobedience of a clear and unequivocal command." Birchall, petitioner, 454 Mass. 837, 853 (2009). It is well settled that an agreement to reduce child support that has not been approved by the court cannot constitute a defense to a complaint for contempt. See Quinn v. Quinn, 49 Mass. App. Ct. at 148. Here, the judge acknowledged that, in light of Quinn, the 2009 agreement could not "be used as a bar . . . or a defense" to the mother's complaint for contempt. However, the judge found that "it was not undoubted disobedience for [the] [f]ather to direct a one-third portion of

his support toward the care of Elliot, who was residing with [the] [f]ather and entirely economically dependent on [the] [f]ather." The judge concluded that, because "Elliot actually benefitted from [the] [f]ather's support," the father was not in contempt of his original child support obligation. It is undisputed that the father directly supported Elliot from January, 2007, until Elliot's emancipation in May, 2013. Accordingly, the judge could properly have found a lack of evidence that the father sought to avoid his support obligation with respect to Elliot, and we discern no error in the judge's conclusion that there was no clear and convincing evidence of contempt. Birchall, petitioner, 454 Mass. at 853.

3. Termination of the father's child support obligation. The mother argues that it was error to terminate the father's child support obligation as of December 31, 2011, as there was "no evidence adduced at trial" to support the judge's finding that the parties' daughter, Hannah, had moved out of the mother's home by that date.[19]

"A trial court's findings of fact will be upheld unless shown to be clearly erroneous." Martin v. Martin, 70 Mass. App. Ct. 547, 548-549 (2007), citing Mass.R.Dom.Rel.P. 52(a). "A

---

[19] The mother does not challenge the judge's conclusion that the other two children, Elliot and Ari, began residing with the father prior to December 31, 2011.

finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Martin, supra at 549, quoting from C. C. & T. Constr. Co. v. Coleman Bros. Corp., 8 Mass. App. Ct. 133, 135 (1979). Here, the judge found that Hannah had moved into the father's home by late December, 2011, a finding that was supported by the father's trial testimony. There is nothing in the record to cause us to disturb the judge's assessment of the father's credibility in this regard.[20] See Johnston v. Johnston, 38 Mass. App. Ct. at 536. We therefore discern no abuse of discretion with respect to the termination date of the father's child support payments.

4. Calculation of child support arrearages. The mother argues that the father's child support arrearages were artificially decreased due to the judge's erroneous calculation of the father's total child support payments. The judge determined that the father had paid a total of $190,737 in child support from January, 2007 to May, 2012. In arriving at that figure, the judge found that the parties stipulated that the

---

[20] The mother testified that Hannah did not move out of her home until the summer of 2012. However, the judge was not required to credit the mother's testimony, Baccanti v. Morton, 434 Mass. 787, 791 (2001), especially where the mother later acknowledged that she did not have suitable living accommodations for Hannah as of May, 2012.

father had made total child support payments of $188,637 (including a $3,500 "lump sum" payment), and that the father had made an additional $2,500 child support payment[21] in April, 2009, when the parties executed the 2009 agreement. The mother contends that the $190,737 figure is clearly erroneous, as the parties stipulated only to payments totaling $185,137, and there is nothing in the record that supports the additional amounts included by the judge. While we discern no error with respect to the inclusion of the $2,500 payment made in April, 2009,[22] it was indeed error to include the $3,500 "lump sum" as a "stipulated" child support payment. As the mother correctly asserts, the parties stipulated only to payments totaling $185,137. While the parties agreed that the father made the $3,500 lump sum payment, they disagreed as to whether the payment was made for the purpose of settling past due child support or old marital debt. Because the parties did not agree regarding the nature of the $3,500 payment, it was error for the judge to treat it as a child support payment on the basis of the

---

[21] Due to a typographical error, the judge added the $2,500 payment to $188,237 (rather than $188,637, a difference of $400), resulting in the $190,737 figure. Without the typographical error, the total would be $191,137. This error carried through into the amended judgments, and must be corrected.

[22] The record adequately supports the judge's finding that the father made a $2,500 child support payment in connection with the execution of the 2009 agreement.

parties having stipulated to same.  Accordingly, because the amount the father should have been credited for child support payments should have totaled $187,637 ($185,137 plus $2,500), his child support arrearages (after applying the $28,177 equitable credit and correcting for the $400 typographical error, see note 21, supra) should have been $38,883, rather than $35,783, and the amended judgments must be modified accordingly.[23]

5.  College expenses.  The mother argues that the judge erred by ordering the mother to contribute to the children's "future" college expenses.  To the extent that the mother is raising a prematurity argument, it is unpersuasive.  Generally, "support orders regarding the future payment of post-high school educational costs are premature and should not be made," Passemato v. Passemato, 427 Mass. 52, 54 (1998), until college is "imminent" for the child.  Ketterle v. Ketterle, 61 Mass. App. Ct. 758, 765 (2004), citing Cabot v. Cabot, 55 Mass. App. Ct. 756, 765 (2002), and Lang v. Koon, 61 Mass. App. Ct. 22, 26 n.11 (2004).  In the present case, all three children were

---

[23] The mother also argues that the judge used a flawed formula that incorrectly credited the father twice for his $6,008 "overpayment" of child support from August 11, 2011, through May, 2012.  However, as the father points out in his brief, the mother appears to be relying on the judge's somewhat confusing explanation of the math, rather than on the math itself, which was correct.  Accordingly, there was no error.

already enrolled in college when the judge ordered the mother to contribute to their college expenses. Accordingly, the judge's order was not premature.[24]

The mother further argues that the judge erred by ordering the mother to contribute to the children's college expenses where the mother was excluded from the college selection process. We are unpersuaded. The judge found that the children selected their respective colleges "without regard to either parent's ability to contribute to college tuition."[25] Although the separation agreement contemplated that the parties would jointly participate in the choice of which college the children would attend, it did not explicitly make payment of either parent's obligation to contribute to the children's college expenses contingent upon being included in the college selection process. Moreover, the judge was well within her discretion to

---

[24] The cases cited by the mother are distinguishable as they involve young children for whom college was not imminent. See, e.g., L.W.K. v. E.R.C., 432 Mass. at 452-454 (order for payment of post-high school education costs for ten year old child was premature); Lang v. Koon, 61 Mass. App. Ct. 22 (2004) (order for payment of post-high school education costs for eleven- and fifteen year old children was premature).

[25] While the mother did not participate in the college selection process, there is no indication in the judge's findings that the mother objected to the colleges selected by the children. Indeed, the mother appears to have consented to Hannah's choice of college, as she agreed in the spring of 2011 to pay for Hannah's education, and she contributed to Hannah's tuition for the spring 2012 semester.

make an order relative to the payment of college expenses, even if the parties had not previously agreed to contribute to them. See Massachusetts Child Support Guidelines § II-F (2013) ("In establishing support orders for children over age 18 . . . the Court shall exercise its discretion in ordering support and/or college contribution").  As such, we discern no abuse of discretion in making the mother "responsible for her proportionate share of the college education costs of the children,"[26] in lieu of paying child support to the father.  See J.S. v. C.C., 454 Mass. 652, 660 (2009) (child support orders are reviewed for abuse of discretion).

Conclusion.[27]  The amended judgment on contempt is modified as follows:  In par. 1, by striking "$35,793.00" and inserting "$38,883.00"; and by striking "$69,968.00" and inserting "73,068.00."  In par. 2, by striking "$35,783.00" and inserting "$38,883.00."

The amended judgment of modification is modified as follows:  In par. 3, by striking "$41,791.00" and inserting

---

[26] See also Massachusetts Child Support Guidelines, principles (The Guidelines are intended "[2] to promote joint parental responsibility for child support in proportion to, or as a percentage of, income").

[27] To the extent that we do not address the parties' other contentions, "they 'have not been overlooked.  We find nothing in them that requires discussion.'"  Department of Rev. v. Ryan R., 62 Mass. App. Ct. 380, 389 (2004), quoting from Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).

"$44,891.00"; and by striking "69,968.00" and inserting "$73,068.00."  As so modified, the amended judgments are affirmed.

<u>So ordered</u>.